1. The phrase, "prohibited liquors and beverages," as defined in the official Code, § 58-101, includes "vinous liquors and beverages," and § 58-109 provides that any rooms or structures used for the unlawful manufacture, sale, keeping for sale or other unlawful disposition, of the liquors and beverages mentioned in section 58-101, are common nuisances, and subject to abatement as such, on complaint of the solicitor-general.
(a) Although several statutes regarding possession and sale of wine have been enacted since the adoption of the Code, such later statutes have not entirely removed possession and sale of wine from the operation of the foregoing provisions, and wine is still a prohibited beverage, within the meaning of such provisions, in any county where the sale is prohibited by election, also in any county where sale is not thus prohibited, if the party selling wine has not obtained a license as required by law.
(b) If the defendant did possess wines and make the sales, at his place of business, as claimed by the plaintiff solicitor-general, the burden was on the defendant to produce his license if he had such. Furthermore, he makes no contention that he did have a license.
2. The evidence as to possessing and selling wine was sufficient to authorize a finding by the trial judge, acting as trior of the facts, that the defendant's place of business was a common nuisance within the meaning of the Code, § 58-109, and consequently the judge did not err on interlocutory hearing in ordering the place closed and enjoining the defendant until further order of the court.
 NO. 15951. NOVEMBER 13, 1947.
On June 2, 1947, L. M. Wyatt, as Solicitor-General of the Coweta Judicial Circuit, filed a suit in equity against J. C. Sprayberry, alleging that he was operating a roadhouse in Carroll County in such manner as to make it a public nuisance, and praying for the abatement of such house or place of business as a public nuisance, and for injunction. The defendant filed an answer, and at a hearing on June 26, 1947, after the introduction of evidence on both sides, the judge granted the interlocutory relief prayed "until further order," and to this judgment the defendant excepted.
The petition contained, among others, the following allegations: The defendant operates a roadhouse located one mile north of Carrollton on the Carrollton and Bremen highway in said county. 3. That he is operating said establishment in such manner as to make it a public nuisance; that said place is used for the sale and unlawful disposition of intoxicating liquors and whisky; that said liquors and beverages are bartered and kept for *Page 28 
sale on said premises; that persons are permitted to resort thereto for the purpose of drinking such liquors and beverages, and said place is a public place where such liquors and beverages are sold and served for beverage purposes; that said place is a blind tiger where intoxicating beverages, beers and wines, and large quantities of the same, are stored for the purpose of sale. In paragraph 3 (f) it was alleged: "Carroll County is a county wherein the sale of whisky and intoxicating liquors, intoxicating beverages and beer is prohibited by law."
The defendant in his answer admitted the allegations in paragraph 3 (f), as stated above, "so far as the defendant's knowledge goes," but denied all other material allegations of the petition. He alleged that he has never operated a "roadhouse," but that he conducts a restaurant and barbecue pit at the location described, where he sells and serves good food, barbecue, and soft drinks; that he has never been guilty of selling whisky, and that he has never kept intoxicating liquors and whiskies on hand for sale or kept them in store; that he has always conducted his place of business in a clean and orderly manner, and has been guilty of no act which would authorize the court to abate or close his place of business as a nuisance.
The following evidence was introduced by the solicitor-general:
H. R. Lambert, deputy sheriff, testified on direct examination: "I don't know exactly how long J. C. Sprayberry has been operating that place, but several years. In reply to the question, if I have ever been there and bought any intoxicating beverages and vinous beverages, I answer yes. I bought some beer there. I haven't bought anything else. I had another fellow to buy some wine but I watched him. I saw the transaction. I was present and saw him buy the wine. It was on Sunday this year, one Sunday . . since the first of January, 1947. That was on Sunday, at night. He bought a pint of wine. I don't remember the name of the wine. We have the wine. That is not the only purchase I ever witnessed there of wine. I saw wine sold there a month or two later. Two State officers drove up there and bought some wine under my direction. They bought a pint of wine and paid $1.50 for it.". Q. "You saw them pay for the wine?" A. "I didn't see how much they paid him, saw them give him the money. I saw him take the wine from him and *Page 29 
bring it back to me. It was on a week day, it wasn't on Sunday. I don't remember the date, didn't have any record. I have searched the place for vinous beverages and intoxicating drinks but not so many times. I found wine and some beer on the premises. One time I found thirty-six cases of wine in this place operated by Mr. Sprayberry, I believe it was 36 cases. It was California wine, 19.21 alcoholic contents. He had 36 cases at that time. That was all the wine I found there at that time. In reply to the question, `Did you find there on another occasion any wine, ale or beer there?' I answer, `Since then I checked up on it and he had twelve cases of wine, twelve or fifteen, and about that many cases of beer. That was about two months ago, I would say. That is the only time we searched the place in a long time.'. . I have made cases against Mr. Sprayberry for selling vinous drinks. As well as I remember, I made two or three out there for selling without license and selling on Sunday. In reply to the question, `Did you ever hear Mr. Sprayberry admit he was selling wine and beer without license?' I answer, `Yes, I was here when he plead guilty.'"
On cross-examination, the witness testified: "I have never seen any whisky out there at all . . I said I found 36 cases of wine out there. As to where we carried it, I answer, we stored it. I think it was carried to my house. I kept it there I guess some two or three weeks. I turned it back to Mr. Sprayberry by order of the State department. I gave it back to Mr. Sprayberry. That was after Mr. Sprayberry was before the city court and they collected a fine. I found some beer in his place the last time I was out there. I don't remember the date. It has been about two months ago. I found beer. Did not find any beer bottles. There were several cases of beer. Mr. Sprayberry carried me out there. I didn't ask him about his beer. I was asking him about wine. He carried me to a little building behind the house, and there was some eight or ten cases of beer there. He said, `Oh, the wine is not in here, it is in the house.' I didn't by the wine on Sunday myself. I bought some wine a month or two ago. The State officers bought some wine. They are Mr. Miller and Mr. Cook. . . I have seen the best people in Carrollton out there. . . I haven't been there much myself. I don't just go up and down the highway. I have been in there *Page 30 
a few times, not so much. So far as I know he serves the best people of Carrollton. I have seen them out there in his place of business. I have seen strangers in there. I never bought this wine personally from Mr. Sprayberry. I never bought any wine from him. Mr. Sprayberry was standing behind the counter. Some cook or a man that was working for him sold me the wine. Mr. Sprayberry didn't sell me any wine out there. It was sold in his place. . . I have been there very little, except a few nights, in the last month or two. I will say a few nights in the last two months. That is not the time I bought the wine. It was prior to that time."
Q. "Wasn't anything wrong within the last few times you have been there?" A. "I wasn't on the inside, I couldn't see inside. I have never seen anything wrong inside of his building. This wine and sale of it was just always outside. One stayed on the outside to wait on people who drove up. I don't know where they got the beer, if it was beer, only from what I saw."
Redirect examination: "In reply to the question, `You say you turned the 36 cases of [wine] back to Mr. Sprayberry, why did you return it?' I answer, because of an order from Mr. Rockman . . of the State of Georgia Revenue Department to deliver it back to Mr. Sprayberry. I don't know what he did with the wine when he got it back. I know what he told me he was going to do with it. He said he was going to get rid of it, he was going to carry it out here to his place. I don't know whether he did or not. After I gave him these 36 cases back, I found some wine there. I have been in his place when I did not see wine. I stopped there occasionally to get some drink. I never saw any wine unless I went around looking for it. It was kept outside. I really don't know where he kept it really. The place I found it, it was stored part of the time out there and part of the time in a little room adjoining the main building, in the same building. Mr. Rockman gave us a written order to turn the wine back to him. Did not return the fine to him."
E. C. Cook testified on direct examination: "I am a revenue officer of the State of Georgia. I don't know J. C. Sprayberry. I know where his place of business is located in this county out here. I visited this place and bought wine there, about a month *Page 31 
and a half or two months ago. I don't know the date. I did not purchase the wine, Mr. Miller got it. I was standing about thirty feet from him. I saw him pay the money, $1.50, I think it was, for a pint of wine. I don't know what kind of wine it was. It was wine, I don't know what kind."
Cross-examination: "Mr. Sprayberry did not sell me that wine."
Redirect examination: "He sold it in my presence, in his place of business, just outside of the door of the building, four or five feet. The wine came from out of his place of business, Sprayberry's place of business, occupied and used as a cafe."
C. E. Miller testified: "I bought a pint of wine there, about two months ago, this year. As to where he got the wine, there was a negro standing near the door, at the entrance, he had on a waiter's apron. I asked him if he was working there with Mr. Sprayberry. He said, `Yes.' I says, `I want a pint of wine, I want sweet wine.' He asked me to give him the money. So I went off and come back and I handed him a five-dollar bill. There was a white man, rather stout, middle-aged, standing in the door, and when I gave him the five-dollar bill he went in the door and handed the money to this man, and he brought me back the wine. The white man gave him the pint of wine in a sack and the change and he gave it to me outside of the door."
B. B. Kilgore, sheriff, testified on direct examination: "I know Mr. J. C. Sprayberry's place of business. I have never been out and searched his place of business. I saw wine in there one time. It was about a year ago, I guess. It was about two or three cases of wine. I had occasion to go out there on account of fighting about two or three times. One time was when some Gypsies were out there. I don't know when it was, several months ago. One more time two boys were out there fighting. I can't say how long it has been, it has been a good while. I arrested them. I have arrested people out there one time. They were drinking, pretty drunk."
Cross-examination: "During the time he has been operating the place I have had two or three calls. He has operated it seven years. He operates a nice place, so far as I know. I visit that place, me and my family, for meals. I have never seen there any misconduct or disorder or anything of the kind when me and *Page 32 
my wife were out there. The best people in Carroll and Carrollton go out there continuously. I have seen preachers there. I have seen people from this and adjoining counties there, especially from Bremen. The only thing I ever heard complaints about was the fights. In my opinion he conducts a nice, upright, clean and wholesome place."
Redirect examination: "I never saw any beer out there. I heard reports he was selling liquor out there. I can't say how many times. I have had several reports about liquor."
Recross examination: "I have never found any whisky out there at all. I have never seen any evidence of it being out there. The Gypsies were camped on the same side of the road. People camp there on the other side of the road frequently. They have shows out there frequently. I have never seen any liquor out there."
Otis King, deputy sheriff, testified on direct examination: "I have had reports about selling whisky out there at this place. It has been a good while. Had a few calls, said he was selling liquor out there. I haven't been out there and made a raid in several years. It has been a good while. I have seen some wine taken from this place. I saw wine, several different kinds. I have seen it in cases. It was in the back, not front."
Cross-examination: "I never found any liquor at Mr. Sprayberry's place of business. These reports I spoke of, I never found anything to justify those reports in my investigation. . . I haven't received any calls from there in the last twelve months. These calls were when the Gypsies were there. Mr. Ben Williams and Hobbs own that land where the cafe is and around there. I wasn't there when this matter about the 36 cases of wine occurred. From all my trips there in my estimation he run an upright place and serves the best people in Carrollton. I have seen them there."
R. B. Muse, a County Commissioner of Carroll County, testified that there had never been a license issued to J. C. Sprayberry or any one else to sell wine and beer in Carroll County.
The solicitor-general also introduced the criminal docket and minute book showing two pleas of guilty to selling wine without a license and sentences based thereon, all having been entered on November 30, 1946. *Page 33 
Defendant's evidence. R. B. Neel testified: "I reside . . about a mile from Mr. Sprayberry's place. For the last few years I have been a frequent visitor at his place. I have never seen any wines, beers or intoxicating liquors stored or sold there while I was there. I have never seen any disorderly conduct there. I have never seen anybody drinking whisky around his place of business while I was there. He has a good reputation. His place is patronized by the best people of Carroll County. I have seen them there. I have never seen any misconduct there. For the last few years I have been there to his place of business two or three times a week. We always go out there Sunday with my wife and family for lunch."
R. C. Shaw, a business man of Carrollton and a former member of the city council, testified: "I know J. C. Sprayberry. I know where his place of business is. I have visited it maybe two or three times a week. I have never seen there any immoral conduct, boisterous conduct, or selling wine, beer, or whisky there. I have never seen any illegal or boisterous conduct there against the morals of the community. The many times I have been out there in his place I carried my family out there. The teacher of the Sunday school class has been out there with his class, of the First Baptist Church. Sprayberry serves many church groups."
The testimony of each of these two witnesses is typical of that given on the hearing by about 20 other citizens of the community. In addition, the defendant introduced affidavits signed by 50 other people, testifying in similar vein in reference to the character and reputation of the place of business operated by the defendant.
1. As we view this case, the correctness of the judgment complained of depends mainly, if not entirely, upon the evidence as to possession and sale of wine, and the law applicable to such facts. We will first consider the law.
The phrase, "prohibited liquors and beverages," as defined in the official Code, § 58-101, includes "vinous liquors and beverages." By other sections of the Code, it was declared unlawful for any person to sell, offer for sale, keep for sale, or keep on hand at a place of business any of such prohibited beverages and liquors *Page 34 
in any quantity, and the commission of any of such acts was made a misdemeanor. Licensing was also prohibited. §§ 58-102, 58-103, 58-123. Another section provided that any rooms or structures used for the unlawful manufacture, sale, keeping for sale or other unlawful disposition, of the liquors and beverages mentioned in section 58-101, supra, or any of them, are common nuisances, and may be abated as such on complaint of the solicitor-general. Code, § 58-109.
The foregoing provisions were codified from the act of 1915, except those contained in § 58-102, which were based both upon that act and the act of 1917. Ga. L. Ex. Sess. 1915, p. 77; Ga. L. Ex. Sess. 1917, p. 18. The language of § 58-109 has been held broad enough to authorize physical abatement by padlocking, where the facts are such as to render the section applicable. Pullen
v. Meadors, 196 Ga. 796, 801 (27 S.E.2d 655).
But several statutes regarding possession and sale of wine, or "vinous liquors and beverages," have been enacted since the adoption of the Code in 1933, and in this case the question is raised as to whether the Code, § 58-101, supra, would now include "vinous liquors and beverages" as one of the classes of prohibited liquors and beverages therein enumerated. In considering this question, it should be observed that none of the later acts relating to wine expressly amended or repealed any of the foregoing provisions of the Code, and that it is only by implication that any of these laws have been changed. A repeal by implication takes place only in so far as a statute is clearly repugnant to a former statute, and is so irreconcilably inconsistent with it that the two can not stand together, or is manifestly intended to cover the subject-matter of the former and operate as a substitute for it. Atlantic Log Export Co. v.Central of Ga. Ry. Co., 171 Ga. 175 (1), 176 (155 S.E. 525).
The wine act of 1935 was a State referendum act, and although it was adopted by the people of the State in a referendum election, it provided for the call of an election in any county to determine whether or not the manufacture and sale of wine should be prohibited in such county. Ga. L. 1935, p. 492, sec. 4. The latter provision was carried forward and made an integral part of an amendatory act that was passed in 1937, and it has not been repealed by any subsequent act, so far as sale is concerned. See *Page 35 Thomas v. Board of Commissioners of Chattooga County,196 Ga. 10 (25 S.E.2d 647); Code (Ann. Supp.), § 58-807; Ga. L. 1947, p. 1178.
The act of 1935, supra, was also limited in its application to wine made from Georgia grapes, fruits, and berries, and as to sale at retail (so far as here material) provided only "that, if any Georgia producer of wine, or wines, desires to sell his product at retail, he may do so in any county where such sale is not prohibited by filing with the ordinary of such county an application in which he shall describe the place at which he desires to retail such wine, and the ordinary shall keep a list of such applicants open to public inspection." So, the right even of a Georgia producer to sell his product at retail was subject to two conditions, one of them being that he must file an application with the ordinary describing the place at which he desires to sell such wine; and the quoted provision was itself repealed and superseded by the act of 1937, supra. Nor, excepting the act of 1935, has any statute enacted since the adoption of the Code purported to authorize the sale of wine without a license from some authority, and this is true even as to counties where the sale is not prohibited by election.
"No person, firm or corporation shall sell, offer for sale, store or possess for the purpose of selling, wines, without first having obtained a license appropriate to the type of business carried on by such person, firm or corporation." Ga. L. 1937, p. 856, sec. 7 (d), Code (Ann. Supp.), § 58-913. For the purpose of the present case, it may be assumed that this provision refers only to licenses or permits issued by the State Revenue Commission, as provided in section 4 of that act.
The same act of 1937 further provided, in section 8, that "Any one who knowingly and with intention to evade" the terms of this act violates any of its terms "shall be guilty of a misdemeanor and punished therefore as is provided by law." Ga. L. 1937, p. 859, Code (Ann. Supp.), § 58-924. As to license by municipalities, see Ga. L. 1941, p. 234, sec. 1, Code (Ann. Supp.), § 58-804.
In view of the rule, as stated above, as to repeals by implication, we are of the opinion that wine is still a prohibited beverage under the Code, § 58-101, in any county where the sale is prohibited *Page 36 
by election, and also in any county where the sale is not thus prohibited, if the party selling it has not obtained a license as required by law. In other words, the sale must be in a county where it is not prohibited, and the seller must also have a license permitting him to sell or deal in wine, in order for this beverage to be removed from the operation of the law as stated in the Code, §§ 58-101 and 58-109, supra.
Nothing to the contrary was provided by the act of February 3, 1938 (Ga. L. Ex. Sess. 1937-38, pp. 103-124). That was a "revenue tax act to legalize and control alcoholic beverages and liquors;" and section 12, relating to fortified wines and providing that "nothing in this act" shall be construed to regulate the sale of such wine or wines made from natural fermentation of fruits, grapes and berries and containing an alcoholic content of not more than 14 percent of alcohol by volume, did not in any way purport to legalize the sale of wine regardless of other laws. Code (Ann. Supp.), § 58-1058. The Malt Beverage Act of 1935, however, expressly excepted malt beverages from the law as contained in the Code, § 58-101. See Ga. L. 1935, pp. 73, 79;Davis v. Lanham, 199 Ga. 839 (35 S.E.2d 458).
Whether or not the pleadings in this case, including an admission in the answer, should be taken to mean that the sale of wine is entirely prohibited in Carroll County as the result of a county election, the evidence was yet sufficient to show that the defendant did not have a license to sell or deal in wine in that county, since the burden was on him to produce a license, if he did possess wines and make the sales, as claimed by the plaintiff solicitor-general. Hardison v. State, 95 Ga. 337 (3), 339 (22 S.E. 681); McGehee v. State, 114 Ga. 833 (1) (40 S.E. 1004); Blocker v. State, 12 Ga. App. 81 (3) (76 S.E. 784). As a matter of fact, there is no contention that he did have a license.
It follows from what has been said that, if the defendant did sell wine, or keep the same on hand for sale, at his place of business, as insisted by the plaintiff, the judgment abating his place of business as a nuisance cannot be held erroneous upon the theory that such beverage was not a prohibited beverage within the meaning of the provisions of the Code to which reference has been made.
2. Was the evidence in this case as to possessing and selling *Page 37 
wine sufficient to authorize a finding by the trial judge, as the trior of the facts, that the defendant's place of business was a common nuisance, subject to abatement on petition of the solicitor-general, within the purview of Code, § 58-109, declaring certain classes of places or structures to be nuisances and subject to such abatement? It appears without dispute that on November 30, 1946, the defendant entered pleas of guilty to two charges of selling wine without a license in Carroll County. This was only about six months before the present suit was instituted on June 2, 1947. Such pleas of guilty were material circumstances for consideration with the other evidence, although it is doubtless true that the evidence as to these pleas, without more, would not have authorized a finding that the defendant's place of business was a common nuisance, within the meaning of statute,at the time the suit was filed. While Deputy Sheriff Lambert testified that he at one time found thirty-six cases of wine in the defendant's place of business, there was nothing in his testimony to indicate when this particular wine was found. Assuming therefore that this evidence should not be considered, we lay aside all reference to the thirty-six cases. But the witness further testified that he had "another fellow," whom he watched, to buy a pint of wine at the defendant's place of business one Sunday "since the first of January, 1947;" also that he saw another sale there "a month or two later," referring to sale of a pint of wine to two State officers, naming them. These officers also testified to the same effect regarding this transaction. Lambert further testified as follows: "Since then I have checked up on it and he had twelve cases of wine, twelve or fifteen. . . That was about two months ago I would say."
The testimony as last quoted would fix the time as being some time during the latter part of April, which would be only about a month before the filing of the suit on June 2; the testimony having been given on June 26, the date of the hearing.
Later on, the witness testified that he visited the defendant's place of business "about two months ago," when the defendant carried him to a little building behind the house and said, "The wine is not in here, it is in the house."
The two State officers mentioned above, in testifying regarding the purchase of the pint of wine to which Lambert had previously *Page 38 
referred, fixed the date as "about a month and a half or two months ago," that is, a month and a half or two months before the hearing on June 26th.
While a single transaction might not be sufficient to authorize abatement of a place of business as a common nuisance, in that the law contemplates some continuity of violation, and the evidence in this case did not show directly any act of possession or sale later than about a month before the suit was filed, yet, in view of the evidence as to pleas of guilty to selling without a license and as to subsequent sales and possession, as just indicated, the judge was authorized to find that the defendant was continuing in such violations of law, and that his place of business was a common nuisance within the statute, at the time the action was instituted.
The defendant introduced an abundance of evidence tending to show that his place of business was patronized by the best people of the community and section, and that the patrons who testified or made affidavits to this effect did not know of any unlawful transaction in reference to the possession or sale of wine, or other matter; but the evidence along this line did not require a finding contrary to the undisputed record evidence as to his pleas of guilty only a few months before the present suit was brought, nor did it conclusively rebut the testimony of the other witnesses as to possession and sale of wine after such pleas had been entered. The judge was authorized to reconcile all the evidence upon the theory that the witnesses for the defendant simply had not known of the facts that were shown by the evidence for the plaintiff. Compare Lokey v. Davis, 194 Ga. 175
(21 S.E.2d 69). We find no reason for reversing the judgment. See generally in this connection: Thornton v. Skelton, 149 Ga. 93
(99 S.E. 299); Bracewell v. Cook, 192 Ga. 678 (16 S.E.2d 432);Ogletree v. Atkinson, 195 Ga. 32 (22 S.E.2d 783);Davis v. Stark, 198 Ga. 223 (31 S.E.2d 592);Elder v. Stark, 200 Ga. 452 (37 S.E.2d 598); Foster v.Carrollton, 68 Ga. App. 796 (24 S.E.2d 143).
Judgment affirmed. All the Justices concur, except Wyatt, J., who took no part in the consideration or decision of this case. *Page 39